# SAMOLE, et al. v FLORIDA POWER & LIGHT COMPANY, et al.

# SAMOLE, et al. v FLORIDA POWER & LIGHT COMPANY, et al.

# GUTHRIE v FLORIDA POWER & LIGHT COMPANY, et al.
## (Consolidated)

Case Nos. 85-2115; 84-2116 and 84-2701

State of Florida, Division of Administrative Hearings

January 9, 1985

## APPEARANCES OF COUNSEL

**Sharon Samole,** petitioner, pro se.

**Jean Guthrie,** petitioner, pro se.

**Walter Guthrie,** petitioner, pro se.

**Peter C. Cunningham, Hopping, Boyd, Green & Sams,** for respondent, Florida Power & Light Company.

**Carol A. Forthman,** Department of Environmental Regulation, for respondent, Department of Environmental Regulation.

## OPINION

## RECOMMENDED ORDER

WILLIAM J. KENDRICK, Hearing Officer.

## PRELIMINARY STATEMENT

The issue raised by these proceedings is whether Respondent, Department of Environmental Regulation (DER), should renew the air source operating permits for electrical generating Units 5 and 6 at Respondent, Florida Power & Light Company's (FPL) Cutler Power Plant in Miami, Florida.

On May 25, 1984, DER issued its notice of intent to renew the operating permit for Cutler Units 5 and 6. Timely requests for hearing, pursuant to Section 120.57, Fla. Stat., were filed by Petitioners Sharon Samole, Jean Guthrie, and Walter Guthrie. Case No. 84-2115 involved a request for hearing on Cutler Unit 5 by Sharon Samole and Jean Guthrie. Case No. 84-2116 involved a request for hearing on Cutler Unit 6 by Sharon Samole and Jean Guthrie. Case No. 84-2701 involved a request for hearing on Cutler Units 5 and 6 by Walter Guthrie. By order dated September 20, 1984, these cases were consolidated for final hearing and for all other purposes.

At final hearing Respondent, FPL, called Jack Thomas—Manager of Power Resources for FPL, W. J. Barrow, Jr.—Manager of Environmental Permitting and Programs for FPL, and Kennard F. Kosky—an expert in air quality modeling, air quality monitoring and air pollution control strategy, as witnesses. FPL offered Exhibits 1 through 15, 15a, 16 through 18, 18a, and 19 through 24, which were received into evidence. Respondent, DER, called Thomas A. Tittle—air compliance engineer for DER's Southeast Florida District Office, and Thomas G. Rogers—an expert in meteorology and air dispersion modeling, as witnesses. Petitioner Sharon Samole testified on her own behalf, and offered Exhibits 1, 3 through 7, 9, 11, 13, 16, 17, which were received into evidence. Petitioner Jean Guthrie testified on her own behalf and called William L. Guthrie as a witness. Ms. Guthrie offered Exhibits 1, 3, 4, 10, 11, and 13, which were received into evidence.

Respondents FPL and DER raised the issue of Petitioner Walter Guthrie's standing at the commencement of the final hearing but did not object to his participation until the presentation of his case. Consequently, Walter Guthrie had the opportunity to cross-examine Respondent's witnesses and to examine Petitioners, Sharon Samole and Jean Guthrie, and the members of the public who testified. Through his participation, Walter Guthrie's Exhibits 2 through 9 were received into evidence. At the commencement of Walter Guthrie's case he was found to lack standing to proceed as a party but was allowed to continue to participate in the hearing by assisting his mother, Jean

100

Guthrie, who was allowed to reopen her case and to present further testimony and offer additional exhibits.

William Lazarus, Edward Johnston, Alice Miller, Harry M. Trafford, Jr., Dorothy L. Youngblood, Sara Wilkerson, and Janet Guthrie, members of the public in attendance at the hearing, were called as witnesses on their own behalf.

Respondent FPL and DER have submitted proposed findings of fact and conclusions of law. No proposed findings of fact and conclusions of law have been submitted on behalf of Petitioners. The parties' proposed findings and conclusions have been reviewed and considered. To the extent that any proposed findings have not been adopted in this Recommended Order, they have been rejected as being contrary to the better weight of the evidence, or as being subordinate, cumulative, immaterial or unnecessary, or as being contrary to the facts as found in this Recommended Order.

## FINDINGS OF FACT

1. The Cutler plant of Respondent, Florida Power & Light Company (FPL), is located in Dade County, Florida, at 14925 Southwest 67th Avenue, approximately 15 miles south of Central Miami on an 80-acre site adjacent to Biscayne Bay. The plant has provided electrical service since 1949. At one time there were six generating units at the plant, but units 1, 2, 3 and 4 have been retired and are no longer in service.

2. Cutler Units 5 and 6 were placed in service in 1954 and 1955, respectively. Both units were placed on extended cold standby in 1976, and were returned to service in 1982. These units are normally used only when other FPL generating units are out of operation or if extremely hot or cold weather creates an unusual electrical demand by FPL's customers.

3. Cutler Unit 5 is a 75 megawatt steam generating unit. Cutler Unit 6 is a 161.5 megawatt steam generating unit. Each unit operates with a combustion engineering design boiler which is capable of burning No. 6 residual fuel, No. 2 distillate fuel, and natural gas. These fuels may be burned independently or in combination with each other. Combustion products from the boilers are exhausted through two separate stacks, each 150 feet in height. When in operation these units emit the following regulated air pollutants: particulate matter, sulfur dioxide, nitrogen oxides, and carbon monoxide.

4. Cutler Units 5 and 6 are "existing fossil fuel steam generators" subject to the emission limiting standards specified in Rule 17-2.600(5)(b), Florida Administrative Code (F.A.C.), the ambient air

quality standards specified in Rule 17-2.300(3), F.A.C., and the ambient air quality standards specified in Section 24-17(1) and (2)(b), Dade County Code.

5. Rule 17-2.600(5)(b), F.A.C., limits: (1) visible emissions to 20 percent opacity, (2) emission of particulate matter to 0.1 pounds per million Btu heat input, maximum 2-hour average, and (3) sulfur dioxide emissions to 1.1 pounds per million Btu heat input.

6. Rule 17-2.300(3), F.A.C., establishes the maximum permitted levels of sulfur dioxide, particulate matter, carbon monoxide and nitrogen dioxide, as follows:

(a) Sulfur Dioxide.

1. Maximum three hour concentration not to exceeded more than once per year—1300 micrograms per cubic meter (0.5 ppm).

2. Maximum 24-hour concentration not to be exceeded more than once per year—260 micrograms per cubic meter (0.1 ppm).

3. Annual arithmetic mean—60 micrograms per cubic meter (0.02 ppm).

(b) Particulate Matter.

1. Maximum 24-hour concentration not to be exceeded more than once per year—150 micrograms per cubic meter.

2. Annual geometric mean-600 micrograms per cubic meter.

(c) Carbon Monoxide.

1. Maximum one hour concentration not to be exceeded more than once per year—40 milligrams per cubmic meter (35 ppm).

2. Maximum eight hour concentration not to be exceeded more than once per year—10 milligrams per cubic meter (9 ppm).

. . . . . . . . . . . .

(e) Nitrogen Dioxide.

1. Annual arithmetic mean-100 micrograms per cubic meter (0.05 ppm).

7. Section 24-17(1) and (2)(b), Dade County Code, establishes the following ambient air quality standards and emission standards for maximum sulfur dioxide concentrations:

(1) Ambient air quality standards. . . .

(a) Annual arithmetic mean-8.6 micrograms per cubic meter (0.003 parts per million);

102

(b) Twenty-four-hour concentration—28.6 micrograms per cubic meter (0.010 parts per million);

(c) Four-hour concentration-57.2 micrograms per cubic meter (0.020 parts per million);

(d) One-hour concentration-286 micrograms per cubic meter (0.100 parts per million).

(2) Emission standards. . . .

. . . . . . . . . . .

(b) Existing sources on the effective date of this section [Ordinance No. 76.52]:

(i) 1.1 pounds per million Btu heat input, maximum two-hour average, when liquid fuel is burned;

8. On June 23, 1983, FPL submitted its application for renewal of the operating permits for Cutler Units 5 and 6 to DER. FPL's initial application contemplated burning No. 6 fuel oil containing up to one percent sulfur content to provide up to 25 percent of the heat input to each unit, with natural gas constituting the remaining 75 percent.

9. During 1982 to 1984 several tests were performed at Units 5 and 6 to determine the level of particulate matter and visible emissions. Particulate and visual emissions testing was conducted at Unit 5 on June 30, 1982, and at Unit 6 on July 9, 1982, with the units burning a mixture of 75 percent natural gas and 25 percent fuel oil containing one percent sulfur. The results of these tests indicated the average particulate emission rate from each unit to be 0.04 pounds per million Btu heat input, as compared to the applicable emission limit of 0.1 pound per million Btu input established by Rule 17-2.600(5)(b), F.A.C. Visual emissions were established at 6 percent for Unit 5 and one percent for Unit 6, as compared to the opacity limit of 20 percent established by Rule 17-2.600(5)(b), F.A.C. Additional visual emission tests were conducted at Units 5 and 6 on August 10, 1983. The results of these tests indicated visible emissions to be less than 5 percent.

10. While FPL's permit application was pending, residents of the neighborhood in the vicinity of the plant expressed concern to DER regarding "plume down wash." "Down wash" is a term used to describe an aerodynamic effect that, at higher wind speeds, causes reduction in pressure on the leeward side of the building or structure resulting in turbulent air flow around and within the cavity. If the exhaust plume from the stack of an air pollution source is near enough to the low pressure cavity, it is drawn into the turbulence and follows

103

the air flow down to the leeward side of the building, thereby increasing the impact of emissions at ground level in the surrounding area.

11. Air quality dispersion modeling is a method of predicting the impact of emissions from air pollution source upon ground level air quality in the surrounding area. Inputs to the model include local meteorological data (wind speed, direction and mixing depth, and atmospheric stability and pressure) and source-specific information regarding stack height and diameter, exhaust gas temperature and velocity, and pollutant emissions rate. The model provides a prediction of the ground level concentration of an air pollutant that will result from an emission source at any geographic point. The maximum point of impact from a particular source, under the "worst case" meteorological conditions, can therefore be identified and the resulting pollutant concentration predicted. Air quality dispersion modeling is a well-accepted technique in the field of air quality control, and specific models have been developed and approved by the United States Environmental Protection Agency.

12. A screening analysis performed by DER meteorologist, Thomas Rogers, indicated that the configuration of the Cutler Units 5 and 6 and their exhaust stacks could create plume down wash. In order to address the potential effects of down wash from Units 5 and 6, FPL retained Environmental Science and Engineering, Inc. (ESE) to perform an air quality dispersion study.

13. The initial ESE study, submitted to DER on February 14, 1984, evaluated the effects of emissions of sulfur dioxide from Units 5 and 6 on ground level air quality in the surrounding area, under both down wash and non-down wash conditions. As was contemplated in FPL's permit applications, this modeling study assumed that up to 25 percent of the heat input to each unit would be provided by No. 6 residual fuel oil containing one percent sulfur, with 100 percent fuel oil being burned during start-up until the unit achieved 25 percent load. The ESE study concluded that, under the worst-case emission and down wash conditions, the sulfur dioxide concentration at the point of maximum impact in the area surrounding the Cutler site would be a: (1) maximum three-hour concentration of 410 micrograms per cubic meter, (2) maximum 24-hour concentration of 114 micrograms per cubic meter, and (3) annual arithmetic mean of 9 micrograms per cubic meter.

14. ESE performed an additional study to evaluate the maximum impact of emissions of three other pollutants (nitrogen dioxide, carbon monoxide, and total suspended particulate) from Units 5 and 6, based

104

on the same fuel assumptions. The predicted ambient air concentrations of these pollutants at the point of maximum impact, and under worst-case down wash and emission conditions, were:

(A) Nitrogen dioxide—annual arithmetic mean of 8.7 micrograms per cubic meter.

(B) Carbon monoxide[x]

(1) Maximum one-hour concentration of 23.3 micrograms per cubic meter.

(2) Maximum eight-hour concentration of 13.9 micrograms per cubic meter.

(C) Total suspended particulate—

(1) Maximum 24-hour concentration of 10.5 micrograms per cubic meter.

(2) Annual geometric mean—0.8 micrograms per cubic meter.

15. ESE subsequently performed a third analysis to determine the sulfur dioxide emission rate from Cutler Units 5 and 6 that would demonstrate compliance with the ambient air quality standards for sulfur dioxide established in the Metropolitan Dade County Pollution Control Ordinance. ESE's analysis concluded that under worst-case building down wash conditions, the maximum 1- and 4-hour sulfur dioxide concentrations from Units 5 and 6 were predicted to be 662 and 248 micrograms per cubic meter. These maximum concentrations were higher than the 1- and 4-hour standards established by the Dade County Code. Based on these results, ESE concluded that compliance with the Dade County ambient air quality standards would require that the maximum sulfur content of fuel oil burned during start-up would have to be limited to 0.23 percent.

16. Additional particulate and visible emissions tests were conducted at Unit 5 on March 1, 1984, and at Unit 6 on February 29, 1984, with the units burning 100 percent natural gas. Unit 5 demonstrated an average particulate emission of 0.02 pounds per million Btu and Unit 6, of 0.01 pounds per million Btu, with neither unit exhibiting any visual emissions.

17. During all compliance testings at Units 5 and 6, the units were operating at a capacity of at least 90 percent maximum load, in accordance with the testing requirements and policy of DER.

18. Based on the results of ESE's third modeling study, FPL amended its permit applications to include a restriction requiring Units 5 and 6 to burn 100 percent natural gas except during start-up, and to

limit the sulfur content of the oil burned during start-up to a maximum 0.2 percent.

19. The air quality dispersion modeling performed by ESE utilized the only model currently approved by the United States Environmental Protection Agency and DER that is capable of taking aerodynamic down wash into consideration. DER's expert in air dispersion modeling found no fault with the conclusions reached in the ESE modeling studies. Possible differences between the actual Cutler plant building dimensions and configurations and those assumed in the modeling studies would not significantly change any of the conclusions reached.

20. The draft permits for Units 5 and 6 would require the burning of 100 percent natural gas, except during periods of unit start-up when fuel oil may contribute up to 170 million Btu per hour of heat input to Unit 5 and 290 million Btu per hour of heat input to Unit 6 (approximately 22 percent of each unit's maximum heat input). In addition, the draft permits limit total sulfur dioxide emissions from Units 5 and 6 to 41.3 pounds per hour and 70.1 pounds per hour, respectively. These sulfur dioxide emission limitations will insure compliance with the Dade County ambient air quality standards for sulfur dioxide, based upon the results of the ESE modeling studies. In order to meet the sulfur dioxide emission limits in the draft permits, the maximum sulfur content of fuel oil burned for Units 5 and 6 would be restricted to 0.23 percent.

21. Operation of Cutler Units 5 and 6 in compliance with the conditions of the draft permits will provide reasonable assurance that the units will not cause any violation of the Dade County ambient air quality standards for sulfur dioxide, or the Florida ambient air quality standards. Use of 100 percent natural gas, except during start-up when residual fuel oil with maximum sulfur content of 0.23 percent is burned, will insure compliance with the emission limiting standards for particular matter, opacity ad sulfur dioxide established for existing fossil fuel steam generators by Rule 17-2.600(5)(b), F.A.C. The use of high quality, "clean", fuel as required by the draft permits, constitutes the most effective air pollution control strategy for Units 5 and 6.

22. The primary concerns expressed by the Petitioners regarding Cutler Units 5 and 6 relate to noise, odors, down wash, and fumes they attribute to operation of the Cutler plant. Although the testimony and evidence on these points related to past experience of Petitioners, they were unable to specify what operating conditions and fuels resulted in the incidences of concern. On at least three of the occasions Jean Guthrie recorded objectionable odors or other effects felt to be attribut-

106

able to the Cutler plant, neither Unit 5 nor Unit 6 was in operation. The record of complaints registered with the Dade County Consumer Advocate, from the time Cutler Units 5 and 6 were reactivated until two weeks before the final hearing, shows that there have been no complaints regarding the plant since June 3, 1983. No evidence was presented demonstrating that any past problems that may have been caused by operation of the Cutler plant will continue under the stringent restrictions on emissions, fuel type, and fuel quality imposed by the draft permit conditions. No violations of ambient air quality standards or emission limitations have been discovered and documented by DER with respect to Cutler Units 5 and 6.

23. Neither Petitioners nor the members of the public that testified produced any evidence that Cutler Units 5 and 6 will be unable to comply with the conditions of the draft permits issued by DER. Nor was any evidence produced demonstrating that operation of Cutler Units 5 and 6 in compliance with the draft permits will result in emissions in excess of the emission limits prescribed under DER's rules, or will cause or contribute to any violations of the Florida or Dade County ambient air quality or emission standards.

24. Petitioner, Walter Guthrie, presently resides in Phoenix, Arizona, where he is employed in a permanent position with American West Airlines, a carrier serving the southwestern and midwestern United States. He has been employed by American West Airlines, and has resided in Phoenix, for approximately 15 months, is registered to vote in the State of Arizona, and has an Arizona driver's license. Walter Guthrie holds no ownership interest in the home located at 6960 Southwest 144 Street, Miami, Florida, which home is owned by his parents, William L. and Jean Guthrie. Walter Guthrie has only visited his parents' home approximately three weeks in the year immediately preceding the final hearing in this case, and while some of his personal property is kept at that location, there is no certainty that Walter Guthrie will at any time in the future take up residence at his parents' home.

## CONCLUSIONS OF LAW

1. The Division of Administrative Hearings has jurisdiction over the parties to, and the subject matter of, these proceedings.

2. When the standing of a Petitioner in a proceeding under Section 120.57(1), Fla. Stat., is questioned, the Petitioner has the burden of establishing that his "substantial interests" are or will be affected by the challenged agency action. *State, Dept. of Health, etc. v. Alice P.*, 367 So.2d 1045 (Fla. 1st DCA 1979). Chapter 120, Fla. Stat., does not

107

attempt to define "substantial interests." The Florida Courts have, however, followed a two-prong test that requires, before a person can be considered to have substantial interests affected by the outcome of a Section 120.57(1) proceedings, he must show: (a) that he will suffer injury in fact which is of sufficient immediacy to entitle him to a Section 120.57(1) hearing, and (b) that his substantial injury is of a type or nature which the proceeding is designed to protect. *See, e.g., City of Panama City v. Board of Trustees of Internal Improvement Fund,* 418 So.2d 1133 (Fla. 1st DCA 1982); *Agrico Chemical Co. v. Department of Environmental Regulation,* 406 So.2d 478 (Fla. 2d DCA 1981).

3. Petitioner, Walter Guthrie, has failed to establish the DER's renewal of the operating permits for Cutler Units 5 and 6 will cause him to suffer injury in fact which is of sufficient immediacy to entitle him to a Section 120.57(1) hearing. In view of his Arizona residence, and the mere possibility that he will be visiting his parents' residence at a time the Cutler plant is in operation, Mr. Guthrie's stake is, at best, highly speculative. Mr. Guthrie's testimony that he will inherit a portion of his parents' residence is a mere expectancy, and likewise speculative. Accordingly, Mr. Guthrie has failed to demonstrate standing to proceed as a party under Section 120.57(1), Fla. Stat.

4. DER has authority to regulate the operation of stationary installations which may reasonably be expected to be a source of air pollution. Chapter 403, Fla. Stat. The applicable DER standards and rules are set forth in Chapters 17-2 and 17-4, F.A.C.

5. Rule 17-4.07(1), F.A.C., provides that DER may issue a permit

. . . only if the applicant affirmatively provides the Department with reasonable assurance based on plans, test results and other information, that the construction, expansion, modification, operation, or activity of the installation will not discharge, emit, or cause pollution in contravention of Department standards or rules. . . .

6. As "existing fossil fuel steam generators," Cutler Units 5 and 6 are subject to the emission limiting standards and ambient air quality standards set forth in Rules 17-2.600(5)(b) and 17-2.300(3), F.A.C., and Section 24-17(1) and (2)(b), Dade County Code.

7. Acceptance of the draft permit conditions restricting the use of residual fuel oil to unit start-up, and limiting the sulfur content of the fuel oil to 0.23 percent, provides reasonable assurance that operation of Cutler Units 5 and 6 will not discharge, emit, or cause pollution in contravention of DER or Dade County standards or rules.

108

Based on the foregoing findings of fact and conclusions of law, it is RECOMMENDED that:

1. The petition of Walter Guthrie be dismissed with prejudice.

2. The Department of Environmental Regulation enter a Final Order renewing the air source operating permits for Florida Power & Light Company's Cutler Units 5 and 6, subject to the general and specific conditions set forth in the draft permits attached to DER's notice of intent dated May 25, 1984.